1  TIMOTHY J. LONG (State Bar No. 137591)
   JULIE A. TOTTEN (State Bar No. 166470)
2  ORRICK, HERRINGTON & SUTCLIFFE LLP
   400 Capitol Mall, Suite 3000
3  Sacramento, California  95814
   Telephone:    916-447-9200
4  Facsimile:    916-329-4900
   E-mail:        tjlong@orrick.com
5  E-mail:        jatotten@orrick.com

6  MICHAEL D. WEIL (State Bar No. 209056)
   ORRICK, HERRINGTON & SUTCLIFFE LLP
7  The Orrick Building
   405 Howard Street
8  San Francisco, California 94105
   Telephone:    415-773-5700
9  Facsimile:    415-773-5759
   E-mail:        mweil@orrick.com

10

   Attorneys for Defendant
11 First NLC Financial Services, LLC

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                         OAKLAND DIVISION

15

16
   JEREMY STANFIELD, ROMONIA              Case No.  C 06-3892 SBA
17 PERSAND, and SHABNAM SHEILA
   DEHDASHTIAN, individually, on behalf of **DEFENDANT FIRST NLC**
18 all others similarly situated, and on behalf of **FINANCIAL SERVICES, LLC'S**
   the general public,                     **OPPOSITION TO PLAINTIFFS'**
19                                          **MOTION FOR CONDITIONAL**
                   Plaintiffs,             **CLASS CERTIFICATION UNDER**
20                                          **FLSA, 29 U.S.C. § 216(b)**
          v.
21                                         Date:        September 26, 2006
   FIRST NLC FINANCIAL SERVICES, LLC,     Time:        1:00 p.m.
22 and DOES 1 through 50, inclusive,      Judge:       Hon. Saundra B. Armstrong
                                          Date Action Filed:  June 22, 2006
23                 Defendants.

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ........................................................................................ 1

II.  STATEMENT OF FACTS ......................................................................... 2

    A.  Procedural Posture ........................................................................... 2

    B.  The Putative Class Members' Duties Vary From Individual-To-Individual ......... 3

        1.  First NLC's business ............................................................ 3

        2.  The putative class members' duties vary ............................... 4

            a.  Loan Officers' perform their jobs differently ................................. 4

            b.  Account Managers/Loan Processors perform their duties differently ........ 5

    C.  Plaintiffs and Their Counsel Have Improperly Used First NLC's Confidential Employee Information to Send Misleading Communications .......... 6

    D.  Plaintiffs' Counsels' Website Is Disrupting This Collective Action ..................... 8

III.  ARGUMENT .............................................................................................. 9

    A.  Courts Are Cautious About Issuing Notice That Will Stir-Up Litigation ............. 9

    B.  The Court Should Remedy Plaintiffs' Misconduct Before Considering Class Certification Or Formal Notice To The Class ............................................ 10

        1.  Plaintiffs' counsel continually engages in misconduct to disrupt collective action proceedings ..................... 10

        2.  Courts may prohibit or supervise plaintiffs' counsel's communications with putative class members .......................... 12

        3.  The Court should prohibit or supervise all further communications by Plaintiffs' counsel. ................................. 13

        4.  The Court should void all consents obtained through Plaintiffs' misleading communications .......................... 14

        5.  The Court should order the Nichols Kaster firm to remove web pages pertaining to this case from its website ........................ 15

        6.  The Court should order the relief sought by First NLC's Motion For Protective Order ................................ 17

    C.  The Court Should Deny Notice Because The Plaintiffs' Evidence Is Insufficient And Untrustworthy ........................ 18

        1.  Courts deny preliminary certification where a fact-intensive inquiry is required .......................... 19

        2.  There are demonstrably many differences and variations in the way which the putative class members perform their job, making class certification inappropriate ..................... 20

        3.  Plaintiffs' declarations are untrustworthy and should be stricken ........... 21

IV.  MODIFICATIONS TO NOTICE .............................................................. 22

    A.  Curative Notice Should Be Given .................................................. 22

**TABLE OF CONTENTS**
**(continued)**

Page

B.    Notice Should be Limited to Employees Who Worked Within the Applicable Statute of Limitations .......................................................................... 22

C.    The Notice Should Explain What Costs, if any, Plaintiffs May Incur ................. 23

D.    Plaintiffs Must Pay for the Notice ......................................................... 23

E.    A Neutral Third Party Should Mail the Notice .................................................. 23

F.    The Notice Period Should be Limited to 45 Days ............................................... 24

G.    The Notice Should be Modified for Fairness ....................................................... 25

V.    CONCLUSION .............................................................................................. 25

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

*Abdallah* v. *The Coca-Cola Co.*,
   186 F.R.D. 672 (N.D. Ga. 1999)............................................................................ 16, 17

5

*Belcher* v. *Shoney's Inc.*,
   927 F. Supp. 249 (M.D. Tenn. 1996) ........................................................................... 22

6

7

*Best Buy Stores, L.P.* v. *Superior Court*,
   137 Cal. App. 4th 772 (2006) ....................................................................................... 24

8

*Bird* v. *Glacier Elec. Coop., Inc.*,
   255 F.3d 1136 (9th Cir. 2001)....................................................................................... 12

9

*Carpenter* v. *United States*,
   484 U.S. 19 (1987)........................................................................................................ 15

10

11

*Gonzalez* v. *Immigration & Naturalization Service*,
   22 F.3d 1441 (9th Cir. 1993) ........................................................................................ 21

12

*Check/Mastermoney Antitrust Litig.*,
   2006 U.S. Dist. LEXIS 19755 (S.D.N.Y. 2006) .......................................................... 18

13

14

*City of San Jose* v. *Super. Ct. (San Jose Mercury News)*,
   74 Cal. App. 4th 1008 (1999) ....................................................................................... 23

15

*Clausman* v. *Nortel Networks, Inc.*,
   2003 U.S. Dist. LEXIS 11501 (S.D. Ind. May 1, 2003) ............................................... 19

16

17

*Colonial Life* v. *Superior Court*,
   31 Cal. 3d 785 (1982) ................................................................................................... 24

18

*Counts* v. *S.C. Elec. & Gas*,
   317 F.3d 453 (4th Cir. 2003)......................................................................................... 20

19

20

*Dale* v. *Dretke*,
   2005 U.S. Dist. LEXIS 33926 (E.D. Tex. Apr. 27, 2005) ............................................ 22

21

*Eisen* v. *Carlisle & Jacquelin*,
   417 U.S. 156 (1974)...................................................................................................... 23

22

23

*Erhardt* v. *Prudential Group, Inc.*,
   629 F.2d 843 (2d Cir. 1980).......................................................................................... 12

24

*Experian Information Solutions, Inc.* v. *Superior Court*,
   138 Cal. App. 4th 122 (2006) ....................................................................................... 24

25

26

*Freeman* v. *Wal-Mart Stores, Inc.*,
   256 F. Supp. 2d 941 (W.D. Ark. 2003)............................................................... 9, 19, 21

27

28

- iii -

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3
*Georgine* v. *Amchem Produs.*,
    160 F.R.D. 478 (E.D. Pa. 1995) ...................................................................... 14

4

*Gerlach* v. *Wells Fargo & Co.*,
5      2006 U.S. Dist. LEXIS 24823 (N.D. Cal. March 28, 2006) ........................................ 9, 10

6
*Gulf Oil Co.* v. *Bernard*,
    452 U.S. 89 (1981) ...................................................................... 17, 18

7
*Haffer* v. *Temple University of Commonwealth System of Higher Education*,
8      115 F.R.D. 506 (E.D. Pa. 1987) ...................................................................... 13

9
*Harper* v. *Lovett's Buffet, Inc.*,
    185 F.R.D. 358 (M.D. Ala. 1999) ...................................................................... 24

10

*Heitmann* v. *City of Chicago*,
11      2004 U.S. Dist. LEXIS 14669 (N.D. Ill. July 30, 2004) ...................................................................... 14

12
*Hoffmann-La Roche, Inc.* v. *Sperling*,
    493 U.S. 165 (1989) ...................................................................... 12, 14

13
*In re Asbestos Litig.*,
14      842 F.2d 671 (3rd Cir. 1988) ...................................................................... 18

15
*In re McKesson HBOC, Inc. Securities Litigation*,
    126 F. Supp. 2d 1239 (N.D. Cal. 2000) ...................................................................... 13, 14, 22

16
*In re Shell Oil Refinery*,
17      152 F.R.D. 526 (E.D. La. 1989) ...................................................................... 13

18
*Jackson* v. *Motel 6 Multipurpose, Inc.*,
    130 F.3d 999 (11th Cir. 1997) ...................................................................... 12, 16

19
*Kelly* v. *San Jose*,
20      114 F.R.D. 653 (N.D. Cal. 1987) ...................................................................... 23

21
*Kleiner* v. *First Nat'l Bank*,
    751 F.2d 1193 (11th Cir. 1985) ...................................................................... 12

22
*Krueger* v. *N.Y. Tel. Co.*,
23      Nos. 93 Civ. 0178 & 1079, 1993 WL. 276058 (S.D.N.Y. July 21, 1992) ...................................................................... 23

24
*Leuthold* v. *Destination America, Inc.*,
    224 F.R.D. 462 (N.D. Cal. 2004) ...................................................................... 9, 10

25
*Lorig* v. *Medical Bd.*,
26      78 Cal. App. 4th 462 (2000) ...................................................................... 23

27
*Losoya, et al.* v. *First NLC Financial Services, LLC*,
    Civil File No. 06-CV-00866-REB-MEH ...................................................................... 2, 13, 15

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Melendez Cintron* v. *Hershey P.R., Inc.*,
   363 F. Supp. 2d 10 (D.P.R. 2005) ................................................................... 14

*Morisky* v. *Public Serv. Elec. & Gas Co.*,
   111 F. Supp. 2d 493 (D.N.J. 2000) ................................................................ 19

*Oppenheimer Fund, Inc.* v. *Sanders*,
   437 U.S. 340 (1978) ......................................................................................... 23

*Planned Parenthood Ass'n* v. *Operation Rescue*,
   50 Cal. App. 4th 290 (1996) ............................................................................ 23

*Planned Parenthood Golden Gate* v. *Super. Ct. (Foti)*,
   83 Cal. App. 4th 347 (2000) ........................................................................... 23

*Prof'l Programs Group* v. *Dep't of Commerce*,
   29 F.3d 1349 (9th Cir. 1994) ...................................................................... 23, 24

*Ramirez* v. *Yosemite Water*,
   20 Cal. 4th 785 (1999) .................................................................................... 20

*Ray* v. *Motel 6 Operating, Ltd.*,
   1996 U.S. Dist. LEXIS 22565 (D. Minn. February 16, 1996) .................... 19, 21

*Reeves* v. *Hanlon*,
   33 Cal. 4th 1140 (2004) .................................................................................. 16

*Sanchez* v. *City of Santa Ana*,
   936 F.2d 1027 (9th Cir. 1990) ........................................................................ 23

*Sawyers* v. *Collins*,
   986 F.2d 1493 (5th Cir. 1993) ........................................................................ 22

*Severtson* v. *Phillips Beverage Co.*,
   137 F.R.D. 264 (D. Minn. 1991) .................................................................... 10

*Silicon Knights* v. *Crystal Dynamics*,
   983 F. Supp. 1303 (N.D. Cal. 1997) .............................................................. 16

*Soto* v. *City of Concord*,
   162 F.R.D. 603 (N.D. Cal. 1995) ................................................................... 23

*Torres* v. *CSK Auto, Inc.*,
   2003 U.S. Dist. LEXIS 25092 (W.D. Tex. Dec. 17, 2003) ....................... 24, 25

*Vaughn* v. *Oak Street Mortgage, LLC*,
   Case No. 5:05-cv-311-Oc-10GRJ, 2006 U.S. Dist. LEXIS 15307 (M.D. Fla. April
   3, 2006) ................................................................................................... 1, 16, 17

*Veliz* v. *Cintas Corp.*,
   2004 U.S. 24871 (N.D. Cal. November 12, 2004) ...................................... 10, 22

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

*Walker* v. *Mountain States Tel. & Tel. Co.*,
    112 F.R.D. 44 (D. Colo. 1986) ................................................................................ 14, 15

*White* v. *Osmose, Inc.*,
    204 F. Supp. 2d 1309 (M.D. Ala. 2002) ...................................................... 25

**STATUTES**

29 U.S.C. § 255(a) ........................................................................................................ 22

29 U.S.C. § 626(b) ....................................................................................................... 15

29 U.S.C. section 216(b) ...................................................................................... 19, 21

FRCP 30(b)(6) ..................................................................................................... 12, 18

**REGULATIONS**

29 C.F.R. § 541.2 ....................................................................................................... 19

29 C.F.R. § 541.202 ............................................................................................. 19, 21

29 C.F.R. § 541.203(b) .............................................................................................. 20

29 C.F.R. § 541.601 .................................................................................................. 20

29 C.F.R. § 780.10 .................................................................................................... 20

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **I.**        **INTRODUCTION**

2            Plaintiffs' Certification Motion puts the cart before the horse.  Before this Court considers

3    the issues raised in Plaintiffs' motion, the Court should first address Plaintiffs' misconduct, which

4    has a direct bearing on the issues raised in the Certification Motion.  As explained in First NLC's

5    earlier-filed Motion for Protective Order, Plaintiffs and their counsel, the Nichols Kaster firm,

6    misappropriated and misused First NLC's employee contact information to send a misleading and

7    incomplete communication to the putative class members.  The letter directs putative class

8    members to Nichols Kaster firm's website, which also contains misleading and inappropriately

9    solicitous information.

10           Specifically, Plaintiffs' communications advise putative class members that First NLC

11   withheld overtime wages owed to them and that they may recover their pay if they consent to join

12   the lawsuit.  The communications also encourage the putative class members to sign and return a

13   consent form to join the litigation.  The fundamental problem with the communications is that

14   they suggest that a class has been certified, that First NLC violated the law and the only thing a

15   putative class member must do to receive money was sign and return a consent form.  The

16   communications are not neutral and objective because, among other reasons, they fail to explain

17   that First NLC denies any wrongdoing.  Moreover, the putative class members are induced to

18   consent to join this lawsuit based on a false impression and without a complete picture of the risks

19   associated with joining the case, including negative consequences that may occur if First NLC

20   prevails.  The communications create confusion, adversely affect the administration of this case

21   and unfairly prejudice First NLC and the putative class members.

22           This is not the first time that the Nichols Kaster firm has engaged in this same misconduct.

23   In 2005, in an FLSA case in Florida, the Nichols Kaster firm misappropriated a list of putative

24   class members and their addresses, sent almost identical misleading letters to those individuals

25   without permission and maintained almost identical inappropriate communications on the firm's

26   website.  *See Vaughn v. Oak Street Mortgage, LLC*, 2006 U.S. Dist. LEXIS 15307, *2-3 (M.D.

27   Fla. April 3, 2006); *see also* Declaration of Michael D. Weil, Ex. A (Civil Docket No. 42 For

28   Case No. 5:05-cv-311-WTH-GRJ).  There, the court granted the Defendant's Motion For

DEFENDANT'S OPP TO PLAINTIFFS' MOTION FOR
CONDITIONAL CLASS CERTIFICATION
C 06-3892 SBA

1  Sanctions and Cease and Desist Order, expressly finding that Plaintiffs' counsel's website and

2  their "dissemination of the Solicitation Letters was misleading and skirted the borders of

3  professionalism, if not the boundaries of ethical behavior." Weil Dec., Ex. A.

4  Despite the *Vaughn* court's strong warning issued only a year ago, the Nichols Kaster firm

5  knowingly committed the same misconduct here.  Thus, before even considering Plaintiffs'

6  Certification Motion and to correct and prevent further abuses, First NLC requests this Court

7  enter an appropriate order prohibiting Plaintiffs' counsel from communicating with the putative

8  class, voiding consent forms procured by the inappropriate communications, requiring the

9  Nichols Kaster firm to remove any reference to this lawsuit from their website, and order the

10 other relief requested by First NLC's Motion For Protective Order.

11 Should the Court decide not to defer ruling on Plaintiffs' Certification Motion, the Court

12 should deny the motion because there are material differences regarding the duties performed by

13 the various putative class members.  Despite the overly simplistic statements in Plaintiffs' cookie-

14 cutter declarations, job duties performed by class members vary from person to person based on

15 factors such as geography, branch management preferences, seniority and others.  Courts

16 routinely reject preliminary certification under these circumstances.  However, should the Court

17 authorize notice to the putative class at this time, it should reject Plaintiffs' proposed notice and

18 order the parties to meet and confer about the appropriate notice.

19 **II.    STATEMENT OF FACTS**

20 **A.    Procedural Posture.**

21 On June 22, 2006, Plaintiffs filed this lawsuit seeking alleged unpaid overtime

22 compensation under the Fair Labor Standards Act ("FLSA") and California Labor Code on behalf

23 of individuals who worked as a First NLC "Loan Officer," "Loan Processor" and/or "Account

24 Manager" at any time in the three years prior to filing the lawsuit.[1] *See* Court Docket No. 1.

---

25 [1] In May 2006, Plaintiffs filed a putative nationwide collective action, entitled *Losoya, et al. v. First NLC Financial Services, LLC*, Civil File No. 06-CV-00866-REB-MEH, in the United States District Court, District of Colorado

26 ("*Losoya* lawsuit").  Weil Dec., ¶ 2.  The *Losoya* lawsuit alleged the same federal causes of action for alleged unpaid overtime compensation under the FLSA as this action on behalf of the same putative class.  On July 13, 2006, the

27 parties filed a joint stipulation to amend the *Stanfield* lawsuit to include an FLSA claim on behalf of the named plaintiffs and a nationwide collective class.  *See id.* at No. 10.  Additionally, certain named plaintiffs from the

28 *Losoya* lawsuit were included in this case.  *See* Court Docket at Entry No. 10.  The Court signed the order to

On August 16, 2006, First NLC filed a Motion For Protective Order setting a hearing on October 17, 2006.  *See* Court Docket No. 32.  That Motion seeks, among other things, an appropriate protective order prohibiting Plaintiffs and their counsel from communicating with the putative class members because Plaintiffs and their counsel have misappropriated and misused First NLC's confidential employee contact information to send an unauthorized, misleading and incomplete pre-certification communication to the putative class.  *Id.*  First NLC's Motion also asks that the Court void the class member consents to join this lawsuit, which were procured through Plaintiffs' improper communications.  *Id.*

On August 22, 2006, on the heels of First NLC's filing of its Motion For Protective Order, Plaintiffs filed a Motion For Conditional Class Certification for hearing on September 26, 2006 (the "Certification Motion").  *See* Court Docket No. 48.  The Certification Motion asks the Court to conditionally certify this case as a collective action.  *Id.*  The Certification Motion also seeks Court permission to send another notice and consent form to the putative class.  *Id.*  The Certification Motion relies on 33 declarations from the putative class and 134 consent forms, which First NLC contends were procured through Plaintiffs' misleading communications.[2]  *Id.*; Court Docket No. 32.

**B.    The Putative Class Members' Duties Vary From Individual-To-Individual.**

**1.    First NLC's business.**

First NLC is a national nonprime residential mortgage lender that enables borrowers to own a home or to use the equity in their homes to improve their lives.  Declaration of Kevin Raney ("Raney Dec."), ¶ 3.  First NLC has two different business divisions: retail and wholesale.  *Id.*  The retail division offers First NLC's lending products directly to borrowers.  *Id.*  The wholesale division works directly with mortgage brokers.  *Id.*  First NLC operates separate wholesale and retail branches and employs different personnel to work in these divisions.  *Id.*

First NLC is headquartered in Deerfield Beach, Florida and has six regional operations

---

consolidate the cases on August 12, 2006.  *See* Court Docket at Entry No. 29.

[2] On August 21, 2006, the Court reassigned First NLC's Motion for Protective Order to Magistrate Larson for hearing on October 18, 2006.  *See* Court Docket No. 44.  On August 28, 2006, First NLC filed a motion under Local Rule 6-3 to modify the hearing dates so that First NLC's motion is heard before or in conjunction with Plaintiffs' motion.  *See* Case Docket No. 58.  To date, the Court has not ruled on First NLC's Rule 6-3 motion.

1   located in Tampa, Florida; Concord, Anaheim and Orange, California; Overland Park, Kansas;

2   and outside of Chicago, Illinois. *Id.* at ¶ 4. First NLC also has approximately 60 field offices

3   across the country originating loans in forty-one (41) states. *Id.* There are approximately 2,100

4   Loan Officers and 320 Account Managers/Loan Processors who have been employed by First

5   NLC since May 2003. *Id.* at ¶ 13.

6                          **2.**     **The putative class members' duties vary.**

7           Plaintiffs' Certification Motion oversimplifies the job duties at issue in this case. There is

8   no standard way in which putative class members perform their jobs *Id.* at ¶ 12. The employees

9   are given tremendous discretion and autonomy to perform their work. *Id.* The way in which they

10  perform their jobs, and the time they spend on any task, varies from person to person. *Id.*

11          Plaintiffs' allegations about the jobs at issue are also incorrect. Plaintiffs claim that the

12  positions of "Loan Processor" and "Account Manager" are virtually identical, the only difference

13  being that Loan Processors work on the retail side of the business while Account Managers

14  handle wholesale matters. This is incorrect. Declaration of Karen Loney ("Loney Dec."), ¶ 4.

15  Persons employed as "Loan Processors" and "Account Managers" may handle either type of

16  accounts. *Id.* Persons employed at First NLC's regional operations centers located west of the

17  Mississippi, are referred to by the Company as Account Managers, while those employed in

18  regional operations centers located east of the Mississippi are called Loan Processors. *Id.*

19  Further, Plaintiffs fail to explain that there are several job categories within each job title. *Id.* at ¶

20  6; Raney Dec., ¶¶ 7, 8, 11.

21          As explained below, individual Account Managers/Loan Processors and Loan Officers

22  perform different job duties depending on a variety of factors. Raney Dec., ¶ 7; Loney Dec., ¶ 5;

23  Declaration of Kevin Ranck ("Ranck Dec.") ¶ 3.

24                         **a.**     **Loan officers' perform their jobs differently.**

25          In general, the Loan Officer's job is to consult with First NLC customers over the

26  telephone, discerning the various needs of each individual customer, and, using his or her

27  knowledge of the industry, to recommend and fit First NLC customers in to the mortgage loan

28  that best suits their financial circumstances and individual needs. Ranck Dec., ¶ 4. However, it is

1  difficult to compare the individual jobs of one Loan Officer to another. *Id*. at ¶ 5.  In any given

2  branch, there are approximately 20 different Loan Officers with 20 different personalities and

3  skill sets. *Id*.  These differences ultimately affect how the Loan Officer spends his or her day. *Id*.

4  For example, a more "seasoned," skilled Loan Officer will likely spend less overall time on the

5  phone consulting with customers as compared to a more junior Loan Officer, who may make

6  twice as many calls to potential customers to initiate the same number of loan applications. *Id*.

7    Within the First NLC  branches, the branch managers are responsible for monitoring their

8  Loan Officers' performance, recognizing areas where Loan Officers may need improvement, and

9  assigning the Loan Officers to additional training or one-on-one coaching. *Id*. at ¶ 6.  Loan

10  officers asked to undergo further training do so during the workday, which would be time spent

11  away from the Loan Officer's other daily job duties and responsibilities. *Id*.

12    Additionally, many of the differences between Loan Officers' individual jobs result from

13  the fact that individual branch managers have different expectations and requirements for their

14  Loan Officers. *Id*. at ¶ 7.  For example, some branch managers employ their more senior Loan

15  Officers as "team leaders." *Id*. at ¶ 7; Raney Dec., ¶ 11.  In addition to their normal job

16  responsibilities, team leaders are tasked with taking on the extra responsibility of training and

17  supervising the branch's more junior Loan Officers. *Id*.  As a result of these additional job duties,

18  Loan Officers who are team leaders are likely to spend less of their day consulting with potential

19  clients, and more time training and mentoring other Loan Officers, as compared with non-team

20  leader Loan Officers. *Id*.  Additionally, on an individual level, the amount of time any given team

21  leader Loan Officer may spend on his or her team leader responsibilities varies depending on the

22  number of junior Loan Officers in a branch at any given time, as well as the team leader's own

23  personality. *Id*.  Team leaders are given a significant amount of discretion to take this mentoring

24  relationship as far as they want to, resulting in a varied amount of time being spent on team leader

25  activities from person to person. *Id*.

26      **b.**  **Account managers/Loan processors perform their duties
   differently.**

27  The duties of employees in the Account Manager/Loan Processor positions vary from

28

DEFENDANT'S OPP TO PLAINTIFFS' MOTION FOR
CONDITIONAL CLASS CERTIFICATION
C 06-3892 SBA

each other based on a variety of factors, such as whether they work on the wholesale or retail side of First NLC, geography, branch manager style and more.  Raney Dec., ¶ 7; Loney Dec., ¶ 5.

The wholesale/retail distinction causes duties to vary for several reasons.  Raney Dec., ¶ 8; Loney Dec., ¶ 7.  As an example, the wholesale Account Manager/Loan Processor works directly with the outside mortgage brokers.  *Id*.  They maintain a relationship with the broker and consult and advise regarding the documentation needed to obtain approval of the loan.  *Id*.  In contrast, retail Account Managers/Loan Processors work only internally with First NLC's various retail branches.  *Id*.  They act as "quarterbacks" of the loan by overseeing the processing of the file, which includes, but is not limited to, reviewing, analyzing documentation and information to clear credit and assessing income and asset conditions.  *Id*.  This requires the Account Manager/Loan Processor to collect and analyze customer information and documentation and determine whether or not it satisfies First NLC's lending guidelines and then advise the company's Loan Officers and other branch office employees if additional documentation is required.  *Id*.  There are also differences in the amount of authority of the Account Manager/Loan Processors on the wholesale side versus retail side.  Raney Dec., ¶ 9; Loney Dec., ¶ 8.

Different geographies also create different duties among the Account Managers/Loan Processors.  Raney Dec., ¶ 10; Loney Dec., ¶ 9.  For example, different states have different requirements for closing the loan, which impacts the duties of Account Managers/Loan Processors. *Id*.  Further, Account Managers/Loan Processors perform different duties based on whether they are Level I, II or III, for example, Level III Account Managers/Loan Processors have authority to approve or clear certain types of loan conditions that other levels do not.  Loney Dec., ¶ 6.

In sum, there are numerous differences between how individual Loan Officers and Account Managers/Loan Processors perform their jobs, making certification inappropriate.

### C.   Plaintiffs and Their Counsel Have Improperly Used First NLC's Confidential Employee Information to Send Misleading Communications.

First NLC takes a number of steps to protect the confidentiality of Company information, and prevent its disclosure to third parties.  Case Docket Nos. 32, 34, 53  In particular, First NLC's

1  employee information, which includes, among other things, contact information, such as phone

2  numbers and home addresses, is classified and treated as confidential information. *Id.*

3        Since approximately May 2006, Plaintiffs' counsel have been targeting potential class

4  members by sending them a misleading letter. *See* Weil Dec. at ¶ 4, Exs. G-H. Each letter is

5  accompanied by a consent form. *Id.* First NLC believes that Plaintiffs' counsel have mailed the

6  letter and consent form to hundreds of former and current First NLC employees to their home

7  and/or personal addresses and that Plaintiffs and/or their counsel likely obtained this contact

8  information from a current or former First NLC employee through the solicitation on the Nichols

9  Kaster firm's website, which is described in more detail below.

10        The letter sent by Plaintiffs' counsel is misleading because, among other things, it implies

11  that a judgment has been entered in this case and that putative class members must merely sign

12  the consent form to recover their pay. The letter states that overtime compensation has been

13  "*withheld* from [the putative class members] during their employment" and counsels that "as a

14  current or former Loan Officer or Loan Processor, you may be eligible to join this lawsuit to

15  recover *your pay*." *Id.* (emphasis added). The letter encourages the recipient that "if you were

16  not compensated for overtime work in any of the past three years and wish to join the lawsuit,

17  please fill out the appropriate form and return to us." *Id.* at ¶ 4, Ex. G. The letter also provides a

18  toll-free number and web site address through which potential class members may contact the

19  Nichols Kaster firm. *See id.* Plaintiffs' counsel has also sent a "Legal Services Agreement" (or

20  retainer letter) to putative class members. *See id.* at ¶ 7, Ex. J.

21        The letter and the Plaintiff Consent Form are misleading because they fail to provide the

22  putative class members with critical information about the legal consequences of consenting to

23  join the lawsuit. In particular, they fail to inform the putative class members:

24      •   that the putative class has not been certified;

25      •   that there has not been a judgment in this case and the Court has not made any

26          determination about Plaintiffs' claims;

27      •   that First NLC denies that it committed any unlawful act and contends that the putative

28          class was properly classified as exempt;

- of the comparative costs and benefits of consenting to the collective action;
- that the putative class members are not entitled to overtime compensation if they were properly classified as exempt;
- that the putative class members will be bound by a judgment if they consent;
- that by consenting to the lawsuit, the putative class members waive their rights to bring their own lawsuit;
- that if the putative class members consent to join the lawsuit and it is successful, Plaintiffs' counsel may retain a large portion of any judgment as fees;
- that if First NLC prevails, the putative class could be liable for certain costs of suit; and
- that by consenting to the lawsuit, they may be subject to the discovery requirements of the Federal Rules of Civil Procedure.

In sum, the communications are fraught with misleading statements, and are likely to confuse and cajole recipients into signing the attached consent form.

### D.    Plaintiffs' Counsels' Website Is Disrupting This Collective Action.

First NLC employees are bound by agreements to refrain from disclosing confidential information that is owned by First NLC to third parties.  *See* Court Docket No. 34, 53 (Leighton Dec. at ¶ 9, Ex. G).  Notwithstanding these agreements, the Nichols Kaster firm maintains a website that encourages First NLC employees to violate their employment agreements and First NLC personnel policies by, without permission, taking First NLC's confidential documents and information and providing them to the Nichols Kaster firm.  Weil Dec., ¶ 8, Ex. L.

Even after First NLC filed its Motion For Protective Order, Plaintiffs' counsel continued to post inappropriate and solicitous messages on the website.  Weil Dec., ¶8, Exs. K & L.  For example, under the heading "Status of the Case,"  Plaintiffs' counsels' website makes a coercive sales pitch to the putative class members to drum up litigation:

> We are also happy to report that former and current employees of First NLC are joining the case at a **roaring pace**, as we currently have close to 140 clients. There is still time to join this case and make a claim for your unpaid overtime compensation. Please contact us.

*Id.* at Ex. L (emphasis added).  The website further advises, under a heading entitled "What about

retaliation?," that "if First NLC or its attorneys approach you to answer questions about this lawsuit, please contact us immediately." *Id.* This website is inappropriate and the Court should order Plaintiffs' counsel to remove information pertaining to this case. For example, instructing First NLC's employees to contact the Plaintiffs' counsel immediately if they are approached by First NLC attorneys to "answer questions about this lawsuit," and putting such an instruction under a heading about "retaliation," wrongfully suggests that any attempt by First NLC or its lawyers to investigate the Plaintiffs' claims is somehow scandalous or improper. The only purpose in posting this message is to cause serious and irreparable harm to First NLC's reputation and its relationship with its employees, which is impermissible.

## III.   ARGUMENT

### A.   Courts Are Cautious About Issuing Notice That Will Stir-Up Litigation.

To certify a collective action, the Court must evaluate whether the lead plaintiffs and the proposed collective action group are "similarly situated." *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004). Courts in the Ninth Circuit apply a two-step approach. *Id.* The first step – which is the subject of Plaintiffs' motion – requires the Court to make an initial "'notice stage' determination of whether plaintiffs are similarly situated, determining whether a collective action should be certified for the purpose of sending notice of the action to potential class members." *Gerlach v. Wells Fargo & Co.*, 2006 U.S. Dist. LEXIS 24823, *6 (N.D. Cal. March 28, 2006).[3] Courts have found a class is "similarly situated" for these purposes if plaintiffs prove that they perform the same tasks, under the same conditions and were compensated in the same manner. On the other hand, courts will not find a class "similarly situated" at this first stage where evidence shows that there are material differences in the duties and responsibilities of proposed class members. *See, e.g., Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 944, 945 (W.D. Ark. 2003) (denying preliminary certification because defendant

---

[3] Assuming the Court approves the first-step, then the case proceeds through discovery. Once discovery is complete, the party opposing class certification may move to decertify the class. *Leuthold*, 224 F.R.D. at 467. The Court then must make a factual determination regarding the propriety and scope of the class and must consider the following factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the defenses available to the defendants with respect to individual plaintiffs; and (3) fairness and procedural considerations. *Id.* Should the Court determine that the plaintiffs are not similarly situated, then the Court may decertify the class and dismiss the opt-in plaintiffs. *Id.*

1   introduced evidence that showed that there were material differences in the duties and

2   responsibilities of the proposed class members). Plaintiffs bear the burden of proving that they

3   are similarly situated with the class they seek to represent. *Leuthold*, 224 F.R.D. at 466.

4           Although, in general, the standard for this first step may be lenient, courts are cautious

5   about approving notice to the putative class for fear of stirring-up litigation. *See, e.g., Severtson*

6   *v. Phillips Beverage Co.*, 137 F.R.D. 264, 266-67 (D. Minn. 1991) (courts "have a responsibility

7   to avoid the "stirring up" of litigation through unwarranted solicitation."). Many courts,

8   including this Court, recognize that issues relating to inappropriate pre-certification

9   communications may influence the Court's decision on preliminary class certification, the content

10  of the notice to the putative class and appropriate notice procedures. *See, e.g., Gerlach v. Wells*

11  *Fargo & Co.*, 2006 U.S. Dist. LEXIS 24823, *12, *17 (N.D. Cal. March 28, 2006); *Veliz v.*

12  *Cintas Corp.*, 2004 U.S. 24871 (N.D. Cal. November 12, 2004).

13          **B.**     **The Court Should Remedy Plaintiffs' Misconduct Before Considering Class**
                        **Certification Or Formal Notice To The Class.**
14

15                     **1.**     **Plaintiffs' counsel continually engages in misconduct to disrupt**
                                   **collective action proceedings.**

16          Plaintiffs' Certification Motion fails to adequately apprise this Court of what has

17  transpired in this case. Plaintiffs have done far more than send "advertising letters" to the class,

18  as they claim. Rather, without permission from First NLC or this Court, Plaintiffs appropriated

19  and used First NLC's confidential employee contact information to send a misleading and

20  incomplete communication to the putative class in order to stir up litigation. Weil Dec., ¶ 4, Ex.

21  G. This communication infringed on First NLC's rights and the privacy rights of its employees

22  and disrupted this collective action proceeding.

23          Plaintiffs' Certification Motion now attempts to make the Court complicit in their

24  misdeeds. In fact, Plaintiffs did not file their Certification Motion until *after* First NLC called the

25  Court's attention to their misconduct through First NLC's Motion for Protective Order. By

26  somehow securing an earlier hearing date, Plaintiffs rushed into Court to request certification and

27  formal notice, perhaps hoping the Court overlooks or absolves them of their misconduct.

28          This is not the first time that this same Plaintiffs' counsel, the Nichols Kaster firm, has

1    engaged in this misconduct.  Indeed, they have already been cited in another case for engaging in

2    the same misconduct as in this case.  In *Vaughn v. Oak Street Mortgage*, Case No. 5:05-cv-311-

3    Oc-10GRJ, Docket No. 42 (M.D. Fla. August 3, 2005) (Weil Dec., Ex. A), the Nichols Kaster

4    firm misappropriated a list of names and addresses for the putative class.  Using that list, the

5    Nichols Kaster firm sent a misleading letter to the putative class and invited them to visit the

6    Nichols Kaster's firm's website.  *Id*. at 7.  The letter in that case is virtually identical to the letter

7    they sent in this case.  *Compare* Weil Dec., Ex. C *with* Ex. G.  Likewise, the content of both

8    websites is substantially similar.  *Compare* Weil Dec., Ex. E *with* Ex. L.

9         Defendant filed a Motion for Sanctions Including a Cease and Desist Order in *Vaughn*.

10   Weil Dec., Ex. B (Case No. 5:05-cv-311-Oc-10GRJ, Docket No. 19).  The court granted the

11   motion.  *Id*. at Ex. A.  The court held "the manner and method by which Nichols Kaster obtained

12   the list of the names and addresses of Oak Street employees who might be potential plaintiffs

13   raises some serious concerns."  *Id*. at 9.  It further held that the letter to the putative class

14   members was "false and misleading" because, among other reasons, it "could deceive a potential

15   plaintiff into believing that nationwide class certification was *fait accompli* [an accomplished and

16   presumably irreversible fact]."  *Id*. at p. 7.  The court similarly found the website to be misleading

17   and "egregious."  *Id*. at 7-8.  The court also found that the solicitation violated the Florida Rules

18   of Professional Responsibility.  *Id*. at 8.  In sum, the court found that the website and "the

19   dissemination of the Solicitation Letter was misleading and skirted the borders of

20   professionalism, if not the boundaries of ethical behavior."  *Id*. at 9-10.  As a remedy, the Court

21   (1) ordered the Nichols Kaster firm to produce a list of the names and addresses of individuals to

22   whom the firm sent the misleading letter (2) authorized a corrective letter (3) ordered the

23   plaintiffs' counsel to cease and desist from sending the misleading letter and (4) ordered the

24   Nichols Kaster firm to remove the web pages concerning the case.  *Id*. at 10.

25        There are no material differences between the Nichols Kaster firm's misconduct in

26   *Vaughn* and this case.  Like the *Vaughn* court, this Court should issue an appropriate remedy and

27   admonish Plaintiffs' counsel for their inappropriate conduct.  The Court should also defer ruling

28   on Plaintiffs' Certification Motion at least until Plaintiffs' misconduct is cured.  The remedies

should include prohibiting Plaintiffs' counsel from further contacting the putative class; voiding the consents procured through Plaintiffs' improper communication; ordering Plaintiffs' counsel to remove prejudicial communications from their website; ordering Plaintiffs' counsel to provide discovery into their misconduct; including an FRCP 30(b)(6) deposition; and the other relief sought by First NLC's Motion For Protective Order.  Without first curing Plaintiffs' abuses, a Court-approved notice will likely contradict Plaintiffs' misleading communications and cause greater confusion, which will make matters worse.  If Plaintiffs' misconduct is not first cured, all further proceedings in this case will be tainted.

### 2. Courts may prohibit or supervise plaintiffs' counsel's communications with putative class members.

The United States Supreme Court in *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 172 (1989) articulated sound rationale as to why Court supervision of pre-certification communications with putative class members is important:

> By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative.  Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed. This procedure may avoid the need to cancel consents obtained in an improper manner.

Indeed, courts recognize the potential for abuse – like in this case – where plaintiffs "use widespread publication of their claims, disguised as class communications, to coerce defendants into settlement." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1004 (11th Cir. 1997) (district court abused its discretion by issuing an order that allowed pre-certification advertisements and mass mailings that were nationwide in scope);[4] *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1203 (11th Cir. 1985) ("unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent"); *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980) ("unapproved notices to class members which are factually or logically incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice").

---

[4] First NLC understands that the decisions of other circuit courts are not binding on this Court.  However, where another circuit has resolved the same question, that holding may be persuasive, especially where – as here – there is no conclusive, binding precedent.  *See Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1145 (9th Cir. 2001).

1    Although some courts have been concerned about issuing an order that would constitute a

2    prior restraint under the First Amendment, those courts readily prohibit counsel from contacting

3    putative class members when that counsel has already sent a misleading or disruptive

4    communication.  *In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1239, 1244-

5    1245 (N.D. Cal. 2000) (prohibiting further communication because plaintiffs' counsel sent

6    misleading communication to the class); *In re Shell Oil Refinery*, 152 F.R.D. 526, 529-35 (E.D.

7    La. 1989) (where plaintiffs' attorneys engaged in instances of solicitation designed to drum up

8    participation in the lawsuit, court enters protective order barring those attorneys from initiating

9    any communication with class members other than their retained clients); *Haffer v. Temple*

10   *University of Commonwealth System of Higher Education*, 115 F.R.D. 506 (E.D. Pa. 1987)

11   (where defendant and its counsel contacted putative class members to discourage them from

12   participating in the lawsuit, court issues order prohibiting them from contacting putative class

13   members).  As explained in the next section,  Plaintiffs' counsel already sent a misleading

14   communication and the Court should intervene.

15              **3.      The Court should prohibit or supervise all further communications by**
                          **Plaintiffs' counsel.**
16
                 This case is illustrative of the need for monitoring communications, and this Court should
17
     prohibit all further communications by Plaintiffs' to the putative class.  Without notifying First
18
     NLC or this Court, Plaintiffs sent an unauthorized letter to at least 120 letters to the putative class
19
     members to stir up litigation.[5]  The letter is misleading, incomplete and an abuse of this class and
20
     collective action process.  The letter implies that the Court has entered judgment against First
21
     NLC for wrongfully withholding overtime compensation.  The letter also suggests that the
22
     putative class members will recover compensation simply by completing a consent form.  While
23
     this is certainly what the Plaintiffs *allege*, the communications are wholly lacking in neutrality or
24
     reality.  The letter is grossly incomplete and misleading:
25
        •  it fails to explain that there has been no judgment entered in the case;
26
        •  it fails to explain that the class has not been certified;
27

28   _____
     [5] Plaintiffs sent the letter during the pendency of the *Losoya* case.  Plaintiffs did not obtain permission from the
     *Losoya* court either.

1    • it fails to advise the putative class members that First NLC denies Plaintiffs' allegations;

2    • it fails to advise the putative class members of the comparative costs and benefits of

3        consenting to the collective action;

4    • it fails to advise that the putative class members are not entitled to anything if the Court

5        finds they were correctly classified as exempt;

6    • it fails to advise that the Plaintiff's counsel may recover its fees if there is a judgment

7        against First NLC;

8    • and it fails otherwise to describe the legal consequences of consenting to this lawsuit.

9            Putative class members who submitted consent forms certainly did not make an informed

10   decision about joining the litigation without the foregoing essential information.  *See* Case Docket

11   Nos. 32 & 33; *In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d at 1244-1245

12   (holding communication was misleading because, among other things, it did not advise that

13   "individual plaintiffs may be subject to the discovery requirements of the Federal Rules of Civil

14   Procedure").

15                   **4.      The Court should void all consents obtained through Plaintiffs'
                              misleading communications.**

16            The Supreme Court authorized district courts to void consents when they are improperly

17   obtained by plaintiffs.  *See Hoffmann-La Roche, Inc.*, 493 U.S. at 172 (monitoring

18   communications with class members "may avoid the need to cancel consents obtained in an

19   improper manner."); *Heitmann v. City of Chicago*, 2004 U.S. Dist. LEXIS 14669, *4-*5 (N.D. Ill.

20   July 30, 2004) (striking consents obtained through plaintiffs' unsupervised notice to putative class

21   members); *Melendez Cintron v. Hershey P.R., Inc.*, 363 F. Supp. 2d 10 (D.P.R. 2005) (voiding

22   consents obtained through plaintiffs' unsupervised and improper notice to the class); *see also*

23   *Georgine v. Amchem Produs.*, 160 F.R.D. 478 (E.D. Pa. 1995) (invalidating opt-outs where third

24   party attorneys sent letters to putative class members and published advertisements in newspapers

25   that contained misleading statements and made one-sided attacks on the settlement without

26   explaining possible settlement benefits).

27            For example, in *Walker v. Mountain States Tel. & Tel. Co*., 112 F.R.D. 44, 48 (D. Colo.

28

1    1986), plaintiffs sent a misleading and defective communication to putative class members

2    without Court approval.  The plaintiffs obtained several consents as a result of the defective

3    notice.  During the preliminary certification proceedings, the Court voided the improperly

4    obtained consents and noted:

5              More troubling is that the notice does not explain the right of each
               potential class member to obtain independent legal representation.
6              The forms were also sent without any notice to opposing counsel
               and incorrectly purport to give consent to representation of claims
7              other than the age discrimination claim. New notice must be sent,
               the form to be agreed upon by all parties.
8
     *Id.* at 48.[6]
9
           Plaintiffs notice, here, implicates the same concerns raised by the *Walker* court.  Although
10
     Plaintiffs ironically claim that "putative members in this case should be given an opportunity to
11
     make an informed decision on whether to join this lawsuit" (Certification Motion 9:5-7),
12
     Plaintiffs' misleading communication has already stripped those putative class members who
13
     submitted forms of their right to make an informed decision.  To cure this prejudice, the Court
14
     should void all consents procured through Plaintiffs' misleading and improper solicitations.
15
                      **5.     The Court should order the Nichols Kaster firm to remove web pages
16                                     pertaining to this case from its website.**

17         Before considering Plaintiffs' Certification Motion, the Court should also order the

18   Nichols Kaster firm to remove information relating to this case from its website at

19   www.overtimecases.com.  The website links to a web page purporting to contain information

20   about the *Losoya* lawsuit.  Under the heading "How can I help with the lawsuit?", Plaintiffs'

21   counsel solicits the putative class members to take and deliver to Plaintiffs' counsel (a) putative

22   class members' contact information "in document form" (b) "any documents or records relating

23   to your employment with First NLC," and (c) "anything" that leads a putative class member to

24   believe that First NLC knew about overtime laws.  Weil Dec., Ex. L.  Not only are these

25   solicitations wrongful and unethical, they also constitute tortious interference with the

26   confidentiality agreements First NLC has with its employees.  *See Carpenter v. United States*,

27

28   _____
     [6] Although *Walker* was an Age Discrimination in Employment Act ("ADEA") case, the certification requirements for
     ADEA cases are the same for FLSA cases.  29 U.S.C. § 626(b).

                                                          DEFENDANT'S OPP TO PLAINTIFFS' MOTION FOR
                                                          CONDITIONAL CLASS CERTIFICATION
                                                          C 06-3892 SBA

1   484 U.S. 19, 26  (1987) ("even in the absence of a written contract, an employee has a fiduciary

2   obligation to protect confidential information obtained during the course of his employment");

3   *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004) (holding that third party's interference with

4   employment relationship is actionable); *Silicon Knights v. Crystal Dynamics*, 983 F. Supp. 1303,

5   1309-1310 (N.D. Cal. 1997) (upholding tortious interference with contract cause of action for

6   inducing employees to breach non-disclosure and confidentiality agreements with employer).

7        The website further advises, under a heading entitled "What about retaliation?," that "if

8   First NLC or its attorneys approach you to answer questions about this lawsuit, please contact us

9   immediately."  Weil Dec., Ex. L.  Instructing First NLC's employees to contact the Plaintiffs'

10  counsel immediately if they are approached by First NLC attorneys to "answer questions about

11  this lawsuit," and putting such an instruction under a heading about "retaliation," wrongfully

12  suggests that any attempt by First NLC or its lawyers to investigate the Plaintiffs' claims is

13  somehow scandalous or improper.  The only purpose in posting that message is to cause serious

14  and irreparable harm to First NLC's reputation and its relationship with its employees.  Such an

15  unethical and unprofessional purpose is not permitted by the courts.  *See Jackso*n, 130 F.3d at

16  1004 (prohibiting plaintiffs' counsel from communicating with putative class members because

17  their communications "are surely causing serious and irreparable harm to Motel 6's reputation

18  and to its relationship with its employees"); *Abdallah v. The Coca-Cola Co.*, 186 F.R.D. 672,

19  677-678 (N.D. Ga. 1999) (ordering plaintiffs to remove their complaint and exhibits from their

20  website because widespread publication might coerce defendants into settlement and cause

21  serious and irreparable harm to employer's reputation and its relationship with its employees);

22  *Vaughn*, 2006 U.S. Dist. LEXIS 15307, *2-3 (M.D. Fla. April 3, 2006), Weil Dec., Ex. A

23  (ordering Nichols Kaster firm to take down their website relating to the case).

24        Plaintiffs'  counsel's website also contains a coercive communication urging putative

25  class members to consent to join this case: "We are also happy to report that former and current

26  employees of First NLC are joining the case at a **roaring pace**, as we currently have close to 140

27  clients. There is still time to join this case and make a claim for your unpaid overtime

28  compensation. Please contact us." *See* Weil Dec., Ex. L.  (emphasis added).  The website also

1   states: "To get involved in the lawsuit, you must complete a Consent Form and return it to us

2   immediately for filing with the Court.  If you do not return this Consent Form, we cannot include

3   you in the lawsuit."  *Id*.

4        These communications are inappropriate because they imply that the only way for

5   putative class members to participate in this lawsuit is to "immediately" complete a consent form

6   out of fear that they will somehow lose out on their rights under this non-existent nationwide

7   collective action.  Indeed, when posting this message, Plaintiffs' counsel knew full well that they

8   intended to file a motion and seek Court approval to facilitate notice and consent forms to the

9   putative class.  Thus, the statement that the class members must "immediately" complete

10  Plaintiffs' counsel's consent form to participate in this lawsuit is flat wrong.  These

11  communications are inappropriately coercive and misleading, as the Court has not even

12  considered a facilitated notice, and their only purpose is to "drum up" participation, which is

13  prohibited.  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 n. 12 (1981).

14       In sum, these communications are disruptive of this collective action and tortiously

15  interfere with and harm First NLC's relationship with its employees.  The Court should order

16  Plaintiffs' counsel to immediately remove all references to this case from their website.  *See*

17  *Vaughn v. Oak Street Mortgage, LLC*, 2006 U.S. Dist. LEXIS 15307, *2-3 (M.D. Fla. April 3,

18  2006) (ordering the Nichols Kaster firm to remove web pages concerning the case); *Abdallah*,

19  186 F.R.D. at 677-678 (ordering plaintiffs to remove their complaint and exhibits from website).

20       **6.     The Court should order the relief sought by First NLC's Motion for Protective Order.**

21  To correct and prevent further abuses, the Court should also order the other relief sought

22  by First NLC's Motion For Protective Order before considering Plaintiffs' Certification Motion.

23  In particular, First NLC requests this Court enter an appropriate order that requires Plaintiffs and

24  their counsel to:

25  •   cease and desist from using First NLC's confidential employee information to solicit First

26      NLC's current and former employees;

27  •   cease and desist from any further communications relating to this lawsuit or the Plaintiffs'

28

1   claims to current and former First NLC employees without first obtaining court approval;

2   • cease and desist from soliciting First NLC employees to provide them with First NLC's

3   documents or confidential information including, but not limited to, removing that

4   solicitation from Plaintiffs' counsel's website;

5   • remind any First NLC employee that contacts plaintiff or Plaintiffs' counsel about the

6   employee's contractual and legal obligations to First NLC;

7   • permit discovery regarding the specifics of how Plaintiffs' counsel obtained First NLC's

8   confidential employee information including, but not limited to, written discovery and a

9   deposition of a person most knowledgeable from Plaintiffs' counsels' law firm, pursuant

10   to Federal Rule of Civil Procedure 30(b)(6);

11   • permit discovery regarding the putative class members who have received Plaintiffs'

12   improper letter and notice; and

13   • return to First NLC all electronic and/or hard copies of First NLC's documents including,

14   but not limited to, any First NLC employee information.

15   There is substantial precedent for the relief First NLC seeks. *See Gulf Oil Co*., 452 U.S. at 104, n.

16   20 ("an order requiring parties to file copies of nonprivileged communications to class members

17   with the court may be appropriate in some circumstances"); *Check/Mastermoney Antitrust Litig.*,

18   2006 U.S. Dist. LEXIS 19755 at *13 (S.D.N.Y. 2006) (in remedying misleading communications

19   by class counsel, courts "may prohibit communications with class members entirely, compel

20   communications correcting misleading statements, and declare contracts between third parties and

21   class members void."); *In re Asbestos Litig.*, 842 F.2d 671, 680, 682 (3rd Cir. 1988) (affirming

22   protective order where non-party association sent information to putative class members that

23   lacked objectivity and neutrality); Weil Dec., Ex. A (*Vaughn*, Civil Docket No. 42 For Case No.

24   5:05-cv-311-WTH-GRJ) (ordering Nichols Kaster firm to produce discovery regarding contacts

25   with putative class members)).

26   **C.   The Court Should Deny Notice Because The Plaintiffs' Evidence Is Insufficient And Untrustworthy.**

27

28   Even if it were to consider the merits of Plaintiffs' Certification Motion at this time, the

Court should deny preliminary class certification because Plaintiffs' evidence is insufficient and there are material differences between the job duties performed by the putative class members.

## 1.   Courts deny preliminary certification where a fact-intensive inquiry is required.

Courts have made clear that collective actions are inappropriate where fact-intensive inquiries are required into each potential plaintiff's situation. *Morisky v. Public Serv. Elec. & Gas Co*., 111 F. Supp. 2d 493, 499 (D.N.J. 2000) (rejecting proposed collective action where the "exempt or non-exempt status of potentially hundreds of employees would need to be determined on . . . an employee-by-employee basis").  Even at this preliminary class certification stage, courts evaluate whether a case requires a fact-intensive inquiry and will deny facilitation of a notice on that basis.  *See, e.g., Clausman v. Nortel Networks, Inc*., 2003 U.S. Dist. LEXIS 11501, *9-10 (S.D. Ind. May 1, 2003) (denying motion to facilitate notice because "liability to each plaintiff will depend on whether that plaintiff was correctly classified as an 'outside salesman,' [and] the Court will be required to make a fact-intensive inquiry into each plaintiff's employment situation"); *Freeman*, 256 F. Supp. 2d at 945 (appropriate for court to inquire into differences in duties and responsibilities of employees even at early stage; material differences precluded certification); *Ray v. Motel 6 Operating, Ltd.*, 1996 U.S. Dist. LEXIS 22565, at *9-12 (D. Minn. February 16, 1996) (refusing to grant notice under U.S.C. section 216(b) to potential class members, citing evidence that the class members worked at different locations in different states, that the locations themselves varied in size and types operations, and the actual amounts of overtime allegedly worked varied from plaintiff to plaintiff).

The FLSA and California law (for purposes of the California putative class members) require an individual determination about whether a particular employee is properly classified as exempt.  29 C.F.R. § 541.2 ("the exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet requirements of the regulations in this part"); 29 C.F.R. § 541.202 (whether an employee is exempt "must be applied in the light of all the facts involved in the particular employment situation in which the question arises"); California Wage Order 4-2001 ("the work actually performed by the employee during

the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job"); *Ramirez v. Yosemite Water*, 20 Cal. 4th 785, 802 (1999).

Further, the presence of several exemptions that may apply to the putative class members also precludes class certification. Here, exemptions that may apply to this class include, but are not limited to, the administrative exemption,[7] the highly compensated employee exemption[8] and the California commissioned employee exemption.[9] In deciding whether an employee fits into one or more of the many exempt categories delineated in the FLSA, the Court must conduct an inquiry into the employee's specific job duties. As explained in section II.B. above, there are material variations in the categories of putative class members and their job duties.

**2.    There are demonstrably many differences and variations in the way which the putative class members perform their job, making class certification inappropriate.**

As explained above, Plaintiffs' declarations and Certification Motion grossly oversimplify the job duties of the putative class members. In contrast, the evidence submitted by First NLC confirms that the putative class members' duties vary extensively. For example, job duties performed by putative class members vary from person-to-person based on factors such as geography, branch management preferences, seniority and others. These duties also vary weekly, which is important because, under federal and California law, the Court must determine whether a putative class member primarily spends his or her time on exempt tasks in any given workweek, and an employee's exempt/non-exempt status can vary weekly. *See* 29 C.F.R. § 780.10; *Counts v. S.C. Elec. & Gas,* 317 F.3d 453 (4th Cir. 2003) (classification examined on a week-to-week basis); *Ramirez,* 20 Cal. 4th at 802; Wage Order 4-2001 § (1)(A)(1)(e)-(f) ("The work actually performed by the employee during the course of the work week must, first and foremost, be

---

[7] For example, the federal regulations at 29 C.F.R. § 541.203(b) provide that employees in the financial services industry "generally meet the duties requirement for the administrative exemption, if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products."

[8] *See* 29 C.F.R. § 541.601. Many of the putative class members earn $100,000 a year or more, which is the threshold amount for this exemption. Raney Dec., ¶ 13.

[9] California Wage Order 4-2001 (3)(D).

1    examined").

2          Furthermore, some of the overtime exemptions in this case require employees to regularly

3    exercise "discretion and independent judgment."  Whether a class member does so involves a

4    highly specific analysis that "must be applied in the light of all the facts involved in the particular

5    employment situation in which the question arises."  29 C.F.R. § 541.202.  Plaintiffs' declarants'

6    self-serving declarations portraying themselves as automatons is not believable or correct.  The

7    fact finder will need to analyze the duties of each putative class member to decide whether that

8    person used the requisite discretion and judgment.

9          In sum, because the putative class members' job duties vary dramatically from week-to-

10   week and from each other, class certification is inappropriate.  *Freeman*, 256 F. Supp. 2d at 945

11   (appropriate for court to inquire into differences in duties and responsibilities of employees even

12   at early stage; material differences precluded certification); *Ray v. Motel 6 Operating, Ltd.*, 1996

13   U.S. Dist. LEXIS 22565, at *9-12 (D. Minn. February 16, 1996) (refusing to grant notice under

14   U.S.C. section 216(b) to potential class members, citing evidence that the class members worked

15   at different locations in different states, that the locations themselves varied in size and types

16   operations, and the actual amounts of overtime allegedly worked varied from plaintiff to plaintiff)

17          **3.      Plaintiffs' declarations are untrustworthy and should be stricken.**

18         As explained above, Plaintiffs procured the putative class declarations through an

19   improper and misleading communication.  To preserve the integrity of this process, the Court

20   should not consider them or, in the alternative, give them little weight because they are,

21   essentially, "the fruit of the poisonous tree" *i.e.,* they are the product of improper activity.  Albeit

22   a criminal law concept, the rationale is equally applicable in this context as Plaintiffs should not

23   reap the benefits of their misconduct  *Cf. Gonzalez v. Immigration & Naturalization Service*, 22

24   F.3d 1441, 1448-1449 (9th Cir. 1993) (improperly obtained evidence excluded to deter further

25   violations and preserve judicial integrity).

26          In any event, Plaintiffs' 33 cookie-cutter declarations are untrustworthy on their face.  A

27   side-by-side comparison of the declarations demonstrates few differences in the content and

28   wording.  The replication continues, and constitutes most of the substance of the declarations.

"The number of separate, but substantially identical, affidavits in support of [Plaintiffs'] claim detracts from the credibility of their content and does nothing to enhance their conclusory nature." *Dale v. Dretke*, 2005 U.S. Dist. LEXIS 33926, at *9 (E.D. Tex. Apr. 27, 2005) (reciting findings of fact from habeas court); *Sawyers v. Collins*, 986 F.2d 1493, 1505 (5th Cir. 1993) (affidavits containing identical accounts lack credibility).

The substance of the declarations is also not credible.  They claim that each class member performs the same job for the same amount of time throughout his or her employment and that all putative class members in each job title perform the same duties.  Logically, that makes no sense. It also makes no sense that every Loan Officer's, Loan Processor's and Account Manager's job duties could be summed up by a few lines.  To the contrary, every declaration filed by Plaintiffs admit that their duties were "not limited to" the duties described in the declaration.  This intentional omission is glaring and reveals the rub in Plaintiffs' Certification Motion.  The Court should deny certification.

## IV.   MODIFICATIONS TO NOTICE

Assuming that the Court finds that Plaintiffs have proven the appropriateness of circulation of notice at this time, the proposed notice should be modified as follows:

### A.   Curative Notice Should Be Given.

The Court should order a curative notice be sent to the class that addresses the misleading statements in Plaintiffs' letter and on Plaintiffs' counsel's website.  *See Veliz v. Cintas Corp*., 2004 U.S. 24871 (N.D. Cal. November 12, 2004) (ordering curative notice); *In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d at 1246 (ordering curative notice).

### B.   Notice Should be Limited to Employees Who Worked Within the Applicable Statute of Limitations.

The statute of limitations in an FLSA action is two years, or three years if the plaintiff proves the violation was willful.  29 U.S.C. § 255(a).  Only individuals who worked for First NLC during the maximum statute of limitations period should receive notice of pendency.  *See, e.g., Belcher v. Shoney's Inc.,* 927 F. Supp. 249, 252 (M.D. Tenn. 1996). Plaintiffs' notice intentionally leaves the date empty.  Instead, it should be addressed to "All current and former

1   employees . . . who worked as a Loan Officer, Loan Processor or Account Manager . . . within the

2   last three years . . . ."

3       **C.    The Notice Should Explain What Costs, if any, Plaintiffs May Incur.**

4       Notice should include "any fees or advances a plaintiff would be obligated to pay at any

5   stage of the litigation." *See, e.g., Krueger v. N.Y. Tel. Co.,* Nos. 93 Civ. 0178 & 1079, 1993 WL

6   276058, at *3 (S.D.N.Y. July 21, 1992).

7       **D.    Plaintiffs Must Pay for the Notice.**

8       If the Court approves notice, Plaintiffs should bear the costs of doing so. *Oppenheimer*

9   *Fund, Inc. v. Sanders,* 437 U.S. 340, 356 (1978) (stating that the class representative bears the

10   cost for notice "for it is he who seeks to maintain the suit as a class action and to represent other

11   members of his class"); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178-179 (1974) (The named

12   plaintiffs ordinarily must pay the entire cost of giving notice to the class).

13       **E.    A Neutral Third Party Should Mail the Notice.**

14       Potential class members have a privacy interest in the nondisclosure of their names and

15   home addresses.  "Federal Courts ordinarily recognize a constitutionally-based right of privacy

16   that can be raised in response to discovery requests." *Soto v. City of Concord*, 162 F.R.D. 603,

17   616 (N.D. Cal. 1995).  In this vein, the Ninth Circuit has protected individuals' privacy rights in

18   nondisclosure of their names and addresses in the FOIA context. *See, e.g., Prof'l Programs*

19   *Group v. Dep't of Commerce,* 29 F.3d 1349, 1354 (9th Cir. 1994); *Sanchez v. City of Santa Ana*,

20   936 F.2d 1027, 1033-34 (9th Cir. 1990) (denying plaintiff discovery of non-party personnel files

21   because they contained confidential information irrelevant to plaintiff's claims).

22       Also, in applying federal common law to privacy issues, "federal courts generally should

23   give some weight to privacy rights that are protected by state constitutions or state statute." *Kelly*

24   *v. San Jose*, 114 F.R.D. 653, 656 (N.D. Cal. 1987).  In California, current and former employees

25   unquestionably have a "substantial privacy interest" in keeping their addresses and telephone

26   numbers confidential. *Lorig v. Medical Bd.*, 78 Cal. App. 4th 462, 468 (2000) ("[i]ndividuals

27   have a substantial privacy interest in their home addresses"); *see also Planned Parenthood*

28   *Golden Gate v. Super. Ct.* (Foti)*,* 83 Cal. App. 4th 347, 359 (2000); *City of San Jose v. Super. Ct.*

1   (San Jose Mercury News), 74 Cal. App. 4th 1008, 1019-20 (1999); *Planned Parenthood Ass'n v.*

2   *Operation Rescue*, 50 Cal. App. 4th 290, 299 (1996) ("if a home is involved, the state interest in

3   preserving residential privacy is exceptionally potent").  For this reason, California courts hold

4   that it is  "the duty of the court to supervise class actions should also be exercised to protect the

5   privacy rights of [potential class members]."  *Best Buy Stores, L.P. v. Superior Court*, 137 Cal.

6   App. 4th 772, 778 (2006).  Accordingly, California courts ensure that putative class members

7   receive notice of the right to grant or withhold consent to the release of their home address

8   information.  *See, e.g., Best Buy Stores, L.P.,* 137 Cal. App. 4th at 778 (requiring notification to

9   potential class members and their affirmative consent to provide plaintiff's counsel with private

10  information); *Experian Information Solutions, Inc. v. Superior Court*, 138 Cal. App. 4th 122, 134

11  (2006) (approving use of letter to lessen extent of infringement on privacy rights); *Colonial Life*

12  *v. Superior Court*, 31 Cal. 3d 785, 794-95 (1982) (approving trial court order that third parties be

13  asked their affirmative permission to disclose confidential information).

14      In the FLSA context, a court may fashion notice to avoid the disclosure of non-party

15  employees' addresses or other private information.  *See, e.g., Torres v. CSK Auto, Inc.,* No. EP-

16  03-CA-113, 2003 U.S. Dist. LEXIS 25092, at *9-10 (W.D. Tex. Dec. 17, 2003) ("Defendant will

17  not be ordered to produce [addresses, social security numbers, or phone numbers] of its El Paso

18  employees, but will instead provide a list of all employees to whom the letters were sent, [and]

19  the date of mailing."). When a party invokes a privacy right to prevent the disclosure of

20  information, courts look to whether there is a compelling need for disclosure of private

21  information, and if so, balance that need against the fundamental right to privacy.  *Prof'l*

22  *Programs Group,* 29 F.3d at 1354.

23      Given these privacy rights and Plaintiffs' prior abuse of First NLC's employees' contact

24  information, First NLC urges that a neutral third party send notice to potential plaintiffs, if notice

25  is granted.  Through this method, individual employees retain their privacy, unless and until they

26  affirmatively join the collective action.  This will also give First NLC some protection against

27  Plaintiffs' continued misuse of the employee information.

28

1     **F.**     **The Notice Period Should be Limited to 45 Days.**

2     Allowing potential plaintiffs 45 days in which to opt-in is sufficient. *See, e.g., Harper v.*

3 *Lovett's Buffet, Inc.,* 185 F.R.D. 358, 365 (M.D. Ala. 1999) (setting a 45-day limit for opt-in

4 period); *White v. Osmose, Inc.,* 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002) (same); *Torres*,

5 2003 U.S. Dist. LEXIS 25092, at \*10 (same). Plaintiffs fail to cite any case law in support of

6 their request for a 90-day opt-in period.

7     **G.**     **The Notice Should be Modified for Fairness.**

8     The Notice requires several changes in language to ensure that it does not favor either

9 side. If the Court grants circulation of notice, the Court should order the parties to meet and

10 confer as to the appropriate language to include in the notices.

11 **V.**     **CONCLUSION**

12     First NLC requests that this Court defer its decision on Plaintiffs' Certification Motion,

13 consider First NLC's Motion For Protective Order first and grant the relief requested therein. If

14 the Court considers Plaintiffs' motion, it should deny it in its entirety. If the Court authorizes

15 notice, it should order the parties to meet and confer as to the appropriate language in the notice.

16 Dated: September 5, 2006         TIMOTHY J. LONG
                                JULIE A. TOTTEN

17                                 MICHAEL D. WEIL
                                ORRICK, HERRINGTON & SUTCLIFFE LLP

18

19

20                         By: _____/s/_____
                                Timothy J. Long

21                               Attorneys for Defendant
                          First NLC Financial Services, LLC

22

23

24

25

26

27

28